Argued and submitted December 23, 1992, affirmed June 2, reconsideration denied September 29, petition for review denied October 26, 1993 (318 Or 26)

# STATE OF OREGON,
*Respondent,*

*v.*

# ROGER KENT UNDERHILL,
*Appellant.*

(C 91-1003; CA A72942)

853 P2d 847

Clint A. Lonergan, Portland, argued the cause for appellant. With him on the brief was Richard L. Lonergan, Portland.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Charles S. Crookham, Attorney General, Virginia L. Linder, Solicitor General, and John Payne, Certified Law Student, Salem.

Before Rossman, Presiding Judge, and De Muniz and Leeson,* Judges.

De MUNIZ, J.

* Leeson, J., *vice* Buttler, J., retired.

## De MUNIZ, J.

Defendant appeals his convictions of driving while revoked and driving in violation of an habitual offender order. ORS 811.182; ORS 811.175. We affirm.

In the evening of May 2, 1991, Officers Zacher and Nader were parked in the parking lot of the Estacada City Hall when Zacher heard what he thought was an argument or commotion in front of a nearby tavern. He saw defendant parking his car. A man on the sidewalk was yelling either at defendant, who was driving, or at his passenger, Sagg. Defendant and Sagg got out of the car and walked to the tavern, and the man who had been yelling walked away. Zacher could not hear what was said, nor did he see anyone make threatening gestures or start to assault anyone. Zacher met defendant in front of the tavern door and stood between him and the door. Nader stood beside defendant and Sagg.

Zacher asked defendant about the argument. Defendant explained that there was no argument, that Sagg had asked the man what band was playing at the tavern. On direct examination, Zacher testified that "I felt that [defendant] and his passenger were telling me the truth." On cross-examination he explained:

"Q. So, after they said there wasn't any argument, that is when you asked [defendant] for essentially identification?

"A. Yes.

"Q. Okay. And I take it that you said you were satisfied with their explanation?

"A. Yes, I was.

"Q. And you asked [defendant] after that for his full name, his date of birth and his Social Security number; correct?

"A. I knew I asked him for his full name and date of birth. I can't remember asking him for his Social Security number.

"Q. And you were going to use that to check things out?

"A. I was going to run a status check on him, yes.

"Q. Okay. And the purpose of that was what?

"A. Just to see if [defendant] had any warrants or —

"Q. Check them out?

"A. Yeah."

Zacher arrested defendant about 15 minutes later.

Defendant testified that the officers told him to "hold up" and that, when Zacher stepped between him and the tavern door, he did not feel free to leave. He testified that he believed that if he had tried to leave, the officer would have grabbed him, and that Zacher had requested his Social Security number.

The trial court ruled that there had been no stop. Defendant argues that that holding was error. He contends that a stop occurred because, under the circumstances, a reasonable person would not have believed that he was free to go.

The Supreme Court sought to clarify when a seizure[1] occurs for purposes of Article I, section 9, of the Oregon Constitution:

> "We hold that a 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances.[19]

> "[19] Any test intended to determine what constitutes a seizure of a person must be expressed in terms that can be understood and applied by the officer. The 'objectively reasonable' requirement in part (b) of our formulation furthers that purpose. An officer should only be responsible for anticipating the effects of his action on an objectively reasonable person, *i.e.*, the officer must be able to treat the individual with whom he is dealing as an objectively reasonable person." *State v. Holmes*, supra n 1, 311 Or at 409.

■ The trial court found that the commotion gave the officers a reason for contacting defendant and that the contact was done in reasonable circumstances: It was a public

---

[1] Defendant phrases his argument in terms of a "stop." Although *State v. Holmes*, 311 Or 400, 813 P2d 28 (1991), discusses what constitutes a seizure for purposes of Article I, section 9, a stop under ORS 131.615 is a "seizure" for constitutional purposes. 311 Or at 408 n 18.

place and there was no excessive demonstration of authority. We agree with the trial court that the contact did not constitute a seizure under *Holmes*.[2]

 Defendant argues that, even if the initial questioning was justified, that justification ended as soon as the officer was satisfied with defendant's explanation. He contends that the officer could not request identification for the sole purpose of running a check. According to defendant:

> "There are few things that Americans regard as more offensive than to be required to produce their name, date of birth and social security number for the purpose of being 'checked out' by the government, when they have done nothing wrong."

As a comment on social customs, defendant may be correct. However, the Supreme Court has implicitly rejected defendant's position:

> "Under these 'seizure' standards, law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them *without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful.* * * * [T]he encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, *even if making inquiries a private citizen would not*, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens." *State v. Holmes, supra* n 1, 311 Or at 410. (Emphasis supplied.)

It appears that, under that test, the scope of the officer's inquiry is unrestricted and the purpose of the officer in pursuing an inquiry has no bearing on whether there is a seizure. Thus, even though most citizens would find it beyond "ordinary social intercourse" to be asked by a stranger for name, date of birth and Social Security number, and would find it objectionable that the inquiries were made, especially

---

[2] Although most people do not feel free to walk around an officer or ignore an officer's questions, under *Holmes* those feelings do not appear to be relevant in determining whether an objectively reasonable person believes that his or her freedom of movement has been significantly restricted.

with the sole purpose of further investigating the individual, those considerations are not factors in determining whether there has been a seizure. It is the physical action of the officer that determines that result. Under *Holmes*, unless there is significant restriction of an individual's liberty by "conduct significantly beyond that accepted in ordinary social intercourse" by an "objectively reasonable" person, an officer may inquire for whatever reason the officer wishes and may make whatever use of the information the officer chooses. Under *Holmes*, that procedure does not violate Article I, section 9.[3]

Affirmed.

---

[3] Defendant has made no separate argument that his federal constitutional rights were violated.