Argued and submitted June 27, 2008, reversed and remanded March 4, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DENNIS W. CHAMBERS,
*Defendant-Appellant.*

Multnomah County Circuit Court
060343216; A133292

203 P3d 337

Zachary L. Mazer, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

David B. Thompson, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Huckleberry, Senior Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

Defendant appeals a judgment of conviction for carrying a concealed weapon. ORS 166.240(1). Defendant assigns error to the denial of his motion to suppress evidence, arguing that, as a result of an officer's unlawful seizure of defendant, that police officer obtained evidence that defendant possessed a dagger. We review the trial court's denial of a motion to suppress for errors of law, *State v. Rider*, 216 Or App 308, 310, 172 P3d 274 (2007), *rev dismissed*, 345 Or 595 (2008), and reverse and remand.

The facts are largely undisputed. Where the facts are disputed, we are bound by the trial court's findings of historical fact if constitutionally sufficient evidence in the record supports those findings. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). In the absence of express findings and where the record contains conflicting evidence, we presume that the trial court found facts consistent with its ultimate conclusion. *Id.*

A Portland Police Officer assigned to the Transit Police Division was riding a MAX train and noticed that defendant appeared to have "passed out * * * in between taking bites" from an open tray of takeout food on his lap. The officer was worried that defendant was intoxicated and concerned for defendant's safety because intoxicated persons often end up in the train yard at the end of the night or become victims of property crimes.

With some difficulty, the officer woke defendant up and, with the help of another transit officer, escorted defendant off the train. The officer did not suspect defendant of having committed any crime and was not intending to hold him in custody. However, the officer testified that defendant was not free to go at that time. The officer explained that he might have allowed defendant to reboard a train later, but he was first "going to see if [defendant] was actually too intoxicated to care for himself." On the station platform, the officer noticed that defendant was slurring his speech and had difficulty standing. The officer continued to assess defendant to determine whether he needed to have defendant transported to a civil detoxification center.

While on the platform, defendant sat down on a bench. The officer requested defendant's identification, and defendant cooperated. The officer ran a warrant check, which revealed that defendant did not have any outstanding warrants. During the time period in which the officer ran the warrant check, defendant leaned over to pick something up off the ground. As defendant leaned over, the officer noticed a knife handle sticking out of defendant's rear pants pocket. The trial court found that the officer saw the knife at the time when the officer "was getting ready to just release" defendant. After seeing the knife, the officer took it, removed it from its sheath, and discovered that it looked like a dagger. Defendant was charged with carrying a concealed weapon, specifically, a dagger.

Before trial, defendant moved to suppress evidence of the dagger. At the motion to suppress hearing, defendant argued that the officer twice had unlawfully seized defendant: first, when the officer took defendant off the Max train and, second, when the officer ran a records check to determine if defendant had any outstanding warrants. Defendant argued that, because the officer had stopped him without reasonable suspicion that he had committed or was about to commit a crime, the officer violated defendant's rights under Article I, section 9, of the Oregon Constitution.[1]

The state argued that the interaction between the officer and defendant did not constitute a stop and that, even if it was a stop, the stop was authorized because the officer was engaging in community caretaking functions under ORS 133.033. The state also responded to defendant's specific arguments about the warrant check, stating that "running the ID is just a standard thing." The state asserted that, because the dagger was in plain view when the defendant leaned over, the officers did not need a warrant to seize it.

After considering the parties' arguments, the trial court ruled:

---

[1] Article I, section 9, states, in part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

"I am going to deny the motion to suppress because I do believe that when the officer initially approach[ed] [defendant], it did was—it was one of a safety check, trying to figure out what was going on.

"Where it's interesting to me is that based on the testimony of [defendant], it doesn't sound like it was a stop. But based on what the officer testified to, there was a stop. So it comes down to credibility.

"And even with the officer stopping [defendant] while he—I agree that there was a stop with him running a check and it looked as if he had cleared and he was getting ready to just release him when, according to [the officer]s' testimony, he saw the knife versus what [defendant] said, was that when he awoke there was a knife.

"In any event, the knife gave enough probable cause for [the officer] to then inquire. So, for that reason, I will deny the motion to suppress. * * *."

■    On appeal, defendant renews his arguments that he was twice unlawfully seized in violation of his rights under Article I, section 9, of the Oregon Constitution.[2] At each of those times, defendant argues, he was seized within the meaning of Article I, section 9. Specifically, defendant argues that taking his identification card and conducting a warrant check was a stop under *Hall*, 339 Or at 19.

Defendant argues that his seizure was *per se* unreasonable and that the state has the burden of proving an exception to the warrant requirement. Defendant argues that there was not even a suspicion that he had committed or was about to commit a crime. Thus, according to defendant, the seizure could not be justified on that ground. Defendant also argues that his seizure could not be justified by the officer's authority to engage in community caretaking functions, ORS 133.033, the officer's authority to hold an intoxicated person, ORS 430.399, or any exception to the warrant requirement. Defendant concludes that, because his seizure

_____

[2] Defendant also argues that the seizure violated his rights under the Fourth Amendment to the United States Constitution. Because defendant did not offer any analysis on any federal constitutional issues before the trial court, we limit our review to defendant's arguments under the Oregon Constitution. *State v. Neill*, 216 Or App 499, 504 n 3, 173 P3d 1262 (2007), *rev den*, 344 Or 671 (2008).

was a "but for" cause of the officer's discovery of the dagger, the trial court erred by denying his motion to suppress.

The state concedes that defendant was seized within the meaning of Article I, section 9, when the officer escorted defendant off the train. The state argues that defendant's seizure was lawful under the community caretaking statute, ORS 133.033. On appeal, however, the state does not address whether defendant's seizure was unlawfully extended when the officer asked for defendant's identification and ran a warrant check. The state explains that defendant did not preserve that argument:

> "The state has not responded to that 'scope of stop' argument because it relates only to defendant's discussion of ORS 430.399, which the state does not rely on here. Insofar as defendant intends for that 'scope' argument to apply to his contention that his detention was unlawful under the community caretaking statute, this court should not consider it, given that defendant did not assert that separate legal theory in any manner below. *See State v. Amaya*, 336 Or 616, [629], 89 P3d 1163 (2004) (refusing to consider defendant's unpreserved arguments that police unlawfully seized him and explaining that '[d]efendant's arguments that we have rejected on preservation grounds * * * are discrete legal theories as to specific actions of the officers, each of which allegedly constituted a seizure')."

Accordingly, this case presents two issues on appellate review. On the merits, the issue is whether a sufficient factual nexus exists between any unlawful seizure of defendant and the officer's discovery of the dagger such that the trial court erred in denying defendant's motion to suppress. We must also determine whether defendant properly preserved that issue.

We first consider preservation. An issue is preserved for appellate review if the trial court has had the opportunity to "identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). Rules of preservation require that no party is taken by surprise, misled, or denied opportunities to respond to an

argument. *State v. Olivar*, 216 Or App 126, 135, 171 P3d 1006 (2007), *rev den*, 344 Or 110 (2008).

■ To preserve a claim that a trial court improperly denied a motion to suppress evidence as a result of an unlawful seizure, a defendant must present at the hearing an argument as to why a specific action of an officer constitutes a seizure. *Amaya*, 336 Or at 630. Accordingly, a defendant who "failed to make any argument to the trial court that [an officer] stopped * * * [defendant] when he took [defendant's] license" has not preserved for appellate review an argument that the taking of the defendant's license constitutes an unlawful stop. *Id.* at 628. Similarly, a defendant did not preserve, for appellate review, the issue whether a patdown search was unlawful where the defendant had filed at trial "a generic motion to suppress * * * focused solely on whether [an officer] had been authorized to ask questions that went beyond the scope of the traffic stop" but had "never referred to the patdown search" conducted by the officer. *Id.* at 628-29. Nonetheless, the Supreme Court cautioned that the requirement that a defendant present each discrete legal theory could lead to problems "if the preservation onion is sliced too thinly." *Id.* at 629.[3]

■ Here, defendant argued at the motion to suppress hearing that the officer's act of running the warrant check was "incompatible" with the officer's justification because, "at that point, there's no longer a concern for community caretaking." Because defendant raised that issue at the hearing, the state was not misled or denied opportunities to respond accordingly. In fact, the state did respond at the hearing by arguing that "running the ID is just a standard thing."

The state suggests that, even if defendant preserved the issue that running the warrant check was an unlawful stop, defendant had a separate obligation to preserve the issue whether an earlier justifiable seizure was unlawfully

---

[3] The Supreme Court explained that preservation requirements are based on two concerns: (1) fairness to the parties in making and responding to the arguments actually made, and (2) efficient administration of judicial administration. *Peiffer v. Hoyt,* 339 Or 649, 656, 125 P3d 734 (2005).

*extended* when the officer ran the warrant check. That preservation argument invites us to require a party to preserve as an issue both the *temporal* persistence of an earlier justification for some police conduct and the *substantive* unlawfulness of later police conduct.[4] Thus, the state's argument invites us to slice the preservation onion too thinly, and we decline that invitation. The preservation analysis in *Amaya* focused on the officer's specific *conduct*—that is, the substantive unlawfulness of that conduct. Here, defendant complained about the substantive unlawfulness of the officer's running of the warrant check. Defendant further articulated that the officer's conduct in running the warrant check was not only unlawful but also "incompatible" with his community caretaking functions. By so complaining, defendant provided appropriate notice to the trial court to identify and correct any alleged error.

██ Having concluded that defendant's argument is preserved, we turn to the merits. As an initial matter, we determine that defendant was seized within the meaning of Article I, section 9, when the officer escorted defendant from the train. As relevant to the factual circumstances of this case, a seizure occurs when "a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement." *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 98 (1991). The officer testified that defendant was not free to go at the time when the officer removed defendant from the train. Accordingly, at that time, the officer had intentionally and significantly interfered with defendant's freedom of movement.[5]

---

[4] We observe that the state's argument presumes that the seizure of defendant began when he was removed from the train and that the trial court so found. However, the trial court did not make that finding on the record. Although the trial court stated that the officer initially approached defendant to conduct a "safety check," the trial court did not identify that initial approach as a stop or a seizure. However, the trial court found that the stop occurred when the officer ran the warrant check. Whether that finding was correct on the merits does not inform our preservation analysis.

[5] At oral argument, the state conceded that "a seizure of [ ] defendant did occur when he was escorted off the train." That concession is appropriate, and we accept it.

In addition, we observe that defendant was not seized prior to that time. An officer may approach persons in public places and the officer is free to "seek their

■■   A warrantless seizure must be justified by a reasonable suspicion of that person's criminal activity or another exception to the warrant requirement. *Holmes*, 311 Or at 407. The officer did not suspect defendant of any criminal activity. Nonetheless, the state argues that the officer's seizure of defendant was justified by the officer's statutory authority to engage in community caretaking functions pursuant to ORS 133.033. ORS 133.033 provides, in part:

"(1)   Except as otherwise expressly prohibited by law, any peace officer of this state * * * is authorized to perform community caretaking functions.

"(2)   As used in this section, 'community caretaking functions' means any lawful acts that are inherent in the duty of the peace officer to serve and protect the public. 'Community caretaking functions' includes, but is not limited to:

"(a)   The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:

"(A)   Prevent serious harm to any person or property;

"(B)   Render aid to injured or ill persons; or

"(C)   Locate missing persons."

The legislative authority granted under ORS 133.033 is subject to constitutional limitations. *State v. Goodall*, 219 Or App 325, 334, 183 P3d 199 (2008). Thus, the state must demonstrate that the officer's removal of defendant from the train was authorized by ORS 133.033 and that that removal was constitutionally permissible. *State v. Martin*, 222 Or App 138, 146, 193 P3d 993 (2008).

We agree that the officer's statutory authority to engage in community caretaking functions—defined as "any lawful acts that are inherent" in an officer's duties—supports the officer's actions in removing defendant from the train. The officer had concerns about defendant's personal safety

cooperation or assistance, request or impart information," even if the encounter causes "inconvenience or annoyance." *Holmes*, 311 Or at 410. Accordingly, during the time when the officer initially began to wake defendant up and before the officer removed defendant from the train, the officer was authorized to approach defendant and to talk with him. At that juncture, the officer had not significantly interfered with defendant's liberty.

because defendant was "passed out" on the train; the officer removed defendant in order to render aid and to prevent serious harm to defendant. However, assuming without deciding that the officer's removal of defendant from the train was constitutionally permissible, we conclude that ORS 133.033 does not justify the officer's decision to run the warrant check.

█    The officer's statutory authority to engage in community caretaking functions cannot justify an open-ended restraint on defendant's freedom. Where police act without a warrant in a noncriminal and nonemergency situation, the conduct at "each step in the police procedure is reasonableness." *State v. Newman*, 292 Or 216, 224, 637 P2d 143 (1981), *cert den*, 457 US 1111 (1982). As we recently stated, "[o]nce the initial justification of a detention of a person by police ends, continued detention requires a separate justification for it to be reasonable under Article I, section 9." *State v. Hitchcock/Winters*, 224 Or App 77, 85, 197 P3d 33 (2008). The statutory authority for providing a community caretaking intervention dissipates when the officer's actions are no longer justified by any community caretaking purpose. *Goodall*, 219 Or App at 335-36. Consequently, the controlling issue in this case is whether ORS 133.033 justified the continued detention of defendant until the time when the officer saw the dagger.

█    The state does not argue that the warrant check was reasonably necessary in order to render aid or to prevent serious harm to defendant. Nor does the state argue that the officer's running of the warrant check had any additional or independent justification. We observe that an officer might ask an apparently incapacitated person for a name, a date of birth, or other information that may assist an officer in determining whether that person is so disoriented as to require medical treatment. However, we do not discern how running a warrant check under the facts of this case served any noncriminal, community caretaking purpose.

Here, the officer's stated community caretaking purpose in removing defendant from the train was to prevent defendant from ending up in the train yard at the end of the night or from becoming a victim of a crime while asleep on the

train. After the officer woke defendant up and removed him to the platform, the officer continued to assess whether defendant was too intoxicated to care for himself. Before the time that the officer saw the knife, however, the evidence reflects that defendant was sober enough to lean over to pick things up off the ground. There is no evidence that the officer asked for defendant's identification to assist him in that assessment and no justification was offered for why the officer's decision to run a warrant check on that identification served any community caretaking purpose. We therefore conclude that that continued seizure was unlawful.

Evidence derived from the unlawful seizure of defendant should generally be suppressed at trial if that evidence is the product of unlawful police conduct. *Hall*, 339 Or at 25. Where a defendant has established a but for relationship between unlawful police conduct and any disputed evidence, the burden shifts to the state to demonstrate that the discovery of the disputed evidence is "independent of, or only tenuously related to, the unlawful police conduct." *State v. Rodgers*, 219 Or App 366, 374, 182 P3d 209, *rev allowed*, 345 Or 301 (2008). Defendant has shown the requisite but for connection because the officer observed the knife only when defendant leaned over during the unlawful seizure. The state has not argued that that discovery was independent of or only tenuously related to the unlawful police conduct; thus, we agree with defendant that the knife was improperly seized. Consequently, the trial court erred by denying defendant's motion to suppress.

Reserved and remanded.