Argued and submitted October 31, 2011, reversed and remanded
January 16, 2013

## STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

## TIMOTHY JOHN WIENER,
*Defendant-Respondent.*

Washington County Circuit Court
C091277CR; A145445

295 P3d 152

Anna M. Joyce, Assistant Attorney-in-Charge, argued the cause for appellant. With her on the brief were John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Mary M. Reese, Senior Deputy Public Defender, argued the cause for respondent. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

In this criminal case, the state appeals the trial court's order granting defendant's motion to suppress evidence obtained during a traffic stop of a truck in which defendant was a passenger. An officer requested and received the driver's consent to search the truck and, when he asked defendant to step out of the truck so it could be searched, saw methamphetamine where defendant had been sitting. The trial court suppressed the evidence resulting from the officer's request for consent to search the truck, on the ground that the request violated Article I, section 9, of the Oregon Constitution[1] because it expanded the scope of the traffic stop and was not supported by reasonable suspicion of criminal activity or a threat to officer safety. The state argues that, although the officer's request for consent was not related to the reasons for the traffic stop and was not supported by reasonable suspicion, it was made during an unavoidable lull in the traffic stop and, therefore, did not extend the duration of the traffic stop. Thus, the state argues, it did not result in an unconstitutional seizure. We agree with the state and, therefore, reverse and remand.

Whether an officer's actions violate Article I, section 9, is a question of law, which we review for legal error. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). When doing so, we are bound by the trial court's factual findings, provided that they are supported by constitutionally sufficient evidence in the record. *Ball v. Gladden*, 250 Or 485, 487-88, 443 P2d 621 (1968). Stated in accordance with that standard, the relevant facts in this case are as follows.

Two police officers, McNair and Vuylsteke, were watching a house where they suspected drug activity took place. They saw a truck drive away from the house and followed it. After seeing the truck make an illegal turn and noticing that its license plates did not reflect a current registration, they initiated a traffic stop. As McNair

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

approached the truck, he saw defendant, who was in the passenger seat, fastening his seatbelt. McNair told the driver why he stopped her and asked for her driver's license, vehicle registration, and proof of insurance. The driver was unable to provide a driver's license but gave McNair her passport. McNair asked defendant for identification and, upon receiving defendant's California identification, told defendant that Oregon law requires passengers to wear seatbelts. McNair handed the identification items to Vuylsteke, who was standing on the passenger side of the truck. Vuylsteke stepped over to the sidewalk to call dispatch for a records check.

While Vuylsteke was calling dispatch, McNair asked the driver if there were any "drugs, weapons, or illegal documents in the vehicle." As McNair testified, the driver

"told me there was nothing in the vehicle. She actually asked me why I was asking, you know, if there was things in the vehicle. So I just gave a brief explanation of, you know, this is my job and I'm here trying to find crimes in progress.[2] And I also explained that I had, you know, arrested somebody that belonged to that house where I was watching for possession of meth, in the past. At that point, I asked her if I could search the vehicle for drugs, weapons, and illegal documents, and she told me in a quote, 'Yeah, go ahead; you won't find anything.' She immediately opened the door and began to step out, so I asked her to wait back with Officer Vuylsteke, where he was standing on the sidewalk conducting the records checks."

McNair described his interaction with the driver as "[c]onversational," like a "typical traffic stop." After the driver left the truck, McNair asked defendant "if he would mind stepping out of the vehicle" so that it could be searched. As defendant opened the truck's passenger side door, McNair saw a small plastic bag containing a crystalline substance that he recognized as methamphetamine. At that point, McNair believed he had probable cause to arrest defendant.

---

[2] Later in his testimony, McNair elaborated on what he had said to the driver. He testified that he told her, "Listen, you know, my job as a patrol officer is [to] be out here investigating people doing things they're not supposed to be doing. If I don't ask people for consent to search their vehicles, then I don't find things. And it's my job to do that."

Defendant stepped out of the truck, and McNair asked him if he had any drugs or weapons on him. Defendant answered that he had a pocket knife and a small bag of marijuana. McNair retrieved the pocket knife and marijuana from defendant and the methamphetamine from the truck. He then arrested defendant.

Vuylsteke did not receive the results of the records check until both the driver and defendant were out of the truck. Finding the driver's information took dispatch "quite a while."

After the state charged defendant with unlawful possession of methamphetamine, defendant filed a motion to suppress the evidence obtained as a result of McNair's request for the driver's consent to the search of the truck. At the hearing on the motion, defendant argued that the request constituted an illegal expansion of the scope of the traffic stop. In defendant's view, statements in the Supreme Court's decision in *State v. Rodgers/Kirkeby*, 347 Or 610, 627, 227 P3d 695 (2010), indicated that Article I, section 9, imposes a subject-matter limitation on inquiries during traffic stops. Based on the court's statements, defendant argued that Article I, section 9, prohibits an officer conducting a traffic stop from inquiring about matters unrelated to the reason for the traffic stop, unless the inquiry is supported by reasonable suspicion of criminal activity or a threat to officer safety. Because McNair did not have such reasonable suspicion, defendant argued that McNair's request for the driver's consent violated Article I, section 9, and the evidence discovered as a result of the request was inadmissible.

The trial court accepted defendant's argument. When doing so, the trial court expressly recognized that the facts of this case differ from those in *Rodgers/Kirkeby* because, unlike in *Rodgers/Kirkeby*, McNair's request for consent did not extend the duration of the traffic stop. Rather, it occurred during what this court has called an "unavoidable lull," that is, a point at which an officer cannot continue to process a traffic stop, such as when an officer is waiting for the results of a records check. And, the trial court recognized that, prior to *Rodgers/Kirkeby*, we had held that an officer may inquire into unrelated matters

during an unavoidable lull in a traffic stop. *See, e.g.*, *State v. Amaya*, 176 Or App 35, 44, 29 P3d 1177 (2001), *aff'd on other grounds*, 336 Or 616, 89 P3d 1163 (2004). But, relying on language in *Rodgers/Kirkeby*, the trial court held that Article I, section 9, prohibits officers from inquiring about unrelated matters during traffic stops, absent reasonable suspicion to do so, even during unavoidable lulls. The trial court explained:

> "[Q]uestioning during a traffic stop relating to criminal activity, unrelated to the traffic stop, and for which there is no reasonable suspicion to suspect the defendant is guilty, violates the defendant's constitutional rights just as much as does extending a traffic stop. * * * [I]t's not just the time, it's [also] the scope of the questioning that matters[.]"

Because the trial court recognized that it was applying *Rodgers/Kirkeby* to a different factual scenario and because it thought that the bench and bar would benefit from clarification of the constitutional limits on police inquiries during traffic stops, the trial court recommended that the state appeal its order.

On appeal, the state argues that the trial court erred in holding that Article I, section 9, imposes a subject-matter limitation on the inquiries that an officer can make during a traffic stop. According to the state, *Rodgers/Kirkeby* did not address and therefore did not overrule our cases establishing that an officer may inquire about unrelated matters during an unavoidable lull in a traffic stop. As support for its argument, the state relies on cases that we decided after the trial court issued its order in this case: *State v. Hall*, 238 Or App 75, 241 P3d 757 (2010), *rev den*, 349 Or 664 (2011), and *State v. Jones*, 239 Or App 201, 245 P3d 148 (2010), *rev den*, 350 Or 230 (2011). In *Hall*, the parties debated the effect of *Rodgers/Kirkeby* on the unavoidable lull rule. We explained:

> "According to defendant, *Rodgers/Kirkeby* dispenses with the distinction between investigation during an unavoidable lull in a traffic stop and investigation that occurs afterwards, and that, in both situations, the investigation is unlawful unless it relates to the traffic offense or the police have reasonable suspicion relevant to a different offense. Defendant points to the following passage:

"'Police authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, noncriminal activity, *viz.*, a traffic infraction. Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed. Other or further conduct by the police, beyond that reasonably related to the traffic violation, must be *justified* on some basis other than the traffic violation.'

"*Rodgers/Kirkeby*, 347 Or at 623 (emphasis in original). According to defendant, that passage refers to unrelated investigations that occur during ('other') and after ('further') the traffic stop; such inquiries that must be justified on some basis other than the traffic violation. Defendant also focuses on the following sentence: 'Police conduct *during* a noncriminal traffic stop does not further implicate Article I, section 9, so long as the detention is limited and the police conduct is reasonably related to the investigation of the noncriminal traffic violation.' *Id*. at 624 (emphasis added). The implication of this statement, defendant argues, is that, if the investigation during or after a traffic stop is *not* 'reasonably related to the investigation' of the violation, it must be justified by independent suspicion.

"The state, however, calls our attention to the following parts of the opinion:

"'[T]he state's assertion—that police may make unrelated inquiries (including requests to search a person or vehicle) during the course of a traffic stop without implicating Article I, section 9—is correct in the sense that verbal inquiries are not searches and seizures. That is, we agree that police inquiries during the course of a traffic stop (including requests to search a person or vehicle) are not searches and seizures and thus by themselves ordinarily do not implicate Article I, section 9. However, police conduct that involves physical restraint or a show of authority that restricts an individual's freedom of movement typically does implicate Article I, section 9.

"'* * * * *

"'* * * Because police inquiries during a traffic stop are neither searches nor seizures, police inquiries in and

of themselves require no justification and do not necessarily implicate Article I, section 9. However, police inquiries unrelated to a traffic violation, when combined with physical restraint or a police show of authority, may result in a restriction of personal freedom that violates Article I, section 9.

"*Id.* at 622-24. These passages, the state maintains, highlight a difference between police *conduct*—in particular, restraints on a person's freedom of movement or other shows of authority—and police *inquiries*, and only conduct requires independent reasonable suspicion. Further, the state maintains, *Rodgers/Kirkeby* does not deal with inquiries or conduct that occurs during an unavoidable lull in a traffic stop. To support that position, the state notes the following footnote:

"'We emphasize that the restriction of movement that implicates Article I, section 9, in both these cases occurred after the police officers had completed their investigations reasonably related to the traffic infraction and issuance of the citation. We express no opinion about the effect of unrelated police inquiries that occur during the course of the traffic violation investigation and that do not result in any further restriction of movement of the individual.'"

*Hall,* 238 Or App at 80-82 (emphasis in original). We noted that "[b]oth parties [had] plausible arguments," but ultimately concluded that the state was correct in its assertion that "*Rodgers/Kirkeby* provides no authority for the proposition that police inquiries during an unavoidable lull in a traffic stop must be justified by independent reasonable suspicion." *Hall,* 238 Or App at 82. We based our conclusion on, *inter alia*, the Supreme Court's statement that it was expressing "no opinion about the effect of unrelated police inquiries that occur during the course of the traffic violation investigation and that do not result in any further restriction of movement of the individual," *Rodgers/Kirkeby*, 347 Or at 627 n 5, and that the requests for consent in *Rodgers/Kirkeby* were not made during unavoidable lulls in the traffic stops; instead, they occurred at points when officers were able to proceed with the traffic stop, but did not. *Hall,* 238 Or App at 83.

After concluding that the Supreme Court's decision in *Rodgers / Kirkeby* did not speak to the continuing viability of the unavoidable lull rule, we reaffirmed the rule, stating:

> "In *State v. Amaya*, 176 Or App 35, 29 P3d 1177 (2001), *aff'd on other grounds*, 336 Or 616, 89 P3d 1163 (2004), we held that there are no Article I, section 9, implications if an inquiry unrelated to a traffic stop occurs during a routine stop but does not delay it. That proposition remains good law[.]"

*Hall*, 238 Or App at 83.

Under the unavoidable lull rule, McNair was free to request the driver's consent while waiting for the results of the records check. Defendant acknowledges that, if *Hall* and *Jones* control, "then this court must find that the basis on which the trial court granted the motion to suppress—that is, that the officer's request for consent and subsequent search exceeded the permissible scope of the traffic stop of the driver—was erroneous." But, defendant argues, *Hall* and *Jones* do not control because they "were wrongly decided."[3] We decline to revisit the issue of the viability of the unavoidable lull rule and therefore reject defendant's argument without further discussion.

Defendant makes a second, alternative argument. He argues that, "even if [McNair's] request for consent did not exceed the permissible scope of the traffic stop of the driver, under the circumstances, the request for consent constituted a second, unconstitutional seizure of the driver for the purpose of conducting a criminal investigation." He further argues that the illegal seizure tainted the driver's consent to search and, therefore, the evidence discovered as a result of that consent.

---

[3] Defendant argues that *Hall* and *Jones* were wrongly decided because "the Oregon Vehicle Code is predominantly a civil, administrative scheme" and, therefore, "a stop to enforce the non-criminal portions of that code must be narrowly tailored to achieve the administrative interests promoted therein without unnecessarily infringing on Article I, section 9, interests." Defendant points out that "'[t]raffic stops should be the minimum possible intrusion on Oregon motorists, and not an excuse to begin questioning, searching or investigating that is unrelated to the traffic reason for the stop.'" *State v. Carter / Dawson*, 287 Or 479, 486, 600 P2d 873 (1979) (quoting *State v. Carter / Dawson*, 34 Or App 21, 32, 578 P2d 790 (1978)).

In support of his argument that McNair illegally seized the driver for the purposes of a criminal investigation, defendant argues that McNair's explanation of why he wanted to search the truck constituted a show of authority that imposed an additional restriction on the driver's freedom of movement. Defendant acknowledges that, in *Rodgers / Kirkeby*, the Supreme Court stated that "police inquiries during the course of a traffic stop (including requests to search a person or vehicle) are not searches and seizures and thus by themselves ordinarily do not implicate Article I, section 9." 347 Or at 622. But, defendant points out, the Supreme Court also stated that "police conduct that involves physical restraint or a show of authority that restricts an individual's freedom of movement typically does implicate Article I, section 9," *id.* at 622, and that "police inquiries unrelated to a traffic violation, when combined with physical restraint or a police show of authority, may result in a restriction of personal freedom that violates Article I, section 9," *id.* at 624. Such other restrictions "must be *justified* on some basis other than the traffic violation." *Id.* at 623 (emphasis in original).

Here, defendant argues that McNair's request to search, combined with his statements about his reasons for investigating the driver, constituted a stop for the purposes of a criminal investigation. Specifically, he argues:

"When the driver asked McNair why he wanted to search her truck, McNair told her that it was 'his job' and that he was 'here trying to find crimes in progress' and that he had arrested a person 'for meth' that had 'belonged' to the house that the driver had just left. Although McNair did not explicitly tell the driver that he believed that she was committing a 'crime in progress' and that he considered it 'his job' to investigate further, his comments had the same effect. Any reasonable person confronted with those comments and the request to search would readily believe that she was the subject of a criminal investigation as well as a non-criminal traffic investigation and that she was not free to leave until both investigations were completed."

Defendant's argument that McNair's statements and request to search constituted a criminal stop, in addition to the traffic stop, is contrary to Oregon case law. We have

held that questions about whether a defendant is engaged in criminal activity do not constitute criminal stops. *State v. Baker*, 154 Or App 358, 360, 961 P2d 913, *rev den*, 327 Or 553 (1998) (officer did not stop the defendant by asking, "[D]id you buy any good crack in there?"); *see also State v. Ashbaugh*, 349 Or 297, 317, 244 P3d 360 (2010) (holding that, "[a]lthough it is possible to restrict a person's liberty and freedom of movement by purely verbal means," the officer did not do so when he asked the defendant whether she had anything illegal in her purse and if he could search it); *State v. Jones*, 241 Or App 597, 604, 250 P3d 452 (2011) (officer did not stop the defendant when he asked the defendant if he was carrying any drugs or weapons and if he would consent to a search). And, we have held that a police officer's statement to a defendant that he is following up on a report of criminal activity does not constitute a criminal stop. *State ex rel Juv. Dept. v. Fikes*, 116 Or App 618, 622, 842 P2d 807 (1992) (officer's statement that he was responding to neighbor's complaints of drug dealing did not transform his conversation with the defendant into a criminal stop).

We have drawn a line, perhaps a fine one, between an officer's statements or actions that would convey, to a reasonable person, that the officer *suspects a defendant might be engaged* in criminal activity and an officer's statements or actions that would convey, to a reasonable person, that the officer *believes the defendant is engaged* in criminal activity. At most, McNair's statements to the driver in this case fall into the first category. As such, they differ from those in cases in which we have held that the officer's statements effected a criminal stop. *See State v. Allen*, 224 Or App 524, 531, 198 P3d 466 (2008) (officer's statement to the defendant that if she gave him the drugs, he would let her off with a citation, effected a seizure of the defendant); *State v. Terhear/Goemmel*, 142 Or App 450, 456, 459, 923 P2d 641 (1996) (officer's statement that he had seen the defendant riding in a car without a seatbelt effected a stop); *see also State v. Levias*, 239 Or App 116, 243 P3d 880 (2010), *adh'd to as modified on recons*, 242 Or App 264, 267, 255 P3d 611 (2011) (the defendant was stopped where the police officer asked if he had a crack pipe, called for backup, and

waited for two additional officers to arrive before searching him).

McNair did not accuse the driver of committing a crime; he did not proceed as if he knew or thought that she possessed contraband.[4] Therefore, we reject defendant's argument that McNair's request for consent constituted a criminal stop.

Reversed and remanded.

---

[4] Instead, McNair's statements conveyed, essentially, that he used traffic stops as fishing expeditions, which raises separate concerns, *see Carter/Dawson*, 287 Or at 486, which—because we employ the unavoidable lull rule—we do not address.